# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **SARAH L. JOHNSON,** | |
| **Plaintiff,** | **No. 16 C 8850** |
| **v.** | **Magistrate Judge Mary M. Rowland** |
| **NANCY A. BERRYHILL,**[1] **Acting Commissioner of Social Security,** | |
| **Defendant.** | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sarah Johnson filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and filed cross motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act.[2] *York v. Massanari*, 155 F.

---

[1] Nancy A. Berryhill is substituted for her predecessor, Carolyn W. Colvin, pursuant to Federal Rule of Civil Procedure 25(d).

Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?

2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work- related activities and is expected to last at least 12 months?

3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?

4. Is the claimant unable to perform his or her former occupation?

5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The SSI regulations are set forth at 20 C.F.R. § 416.901 et seq. The standard for determining DIB is virtually identical to that used for SSI. *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff protectively applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on April 1, 2013, alleging that she became disabled on March 1, 2013, due to a history of chronic discoid lupus, cognitive delay, and dyslexia. (R. at 64). These claims were denied initially and upon reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id*. at 16, 122–23). On November 17, 2014, Plaintiff, represented by counsel, testified at a hearing before Administrative Law Judge (ALJ) David R. Bruce. (*Id*. at 16, 30–63). The ALJ also heard testimony from Tricia Oakes, a vocational expert (VE). (*Id*.).

The ALJ denied Plaintiff's request for benefits on May 12, 2015. (R. at 16–24). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of March 1, 2013. (*Id*. at 18). At step two, the ALJ found Plaintiff's discoid lupus to be a severe impairment. (*Id*. at 18–19). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id*. at 19).

The ALJ then assessed Plaintiff's Residual Functional Capacity (RFC)[3] and determined that Plaintiff has the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations:

---

[3] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum

[Plaintiff] should avoid all exposure to unprotected heights; moving mechanical parts, or operat[ing] a motor vehicle as part of the job. [She] must avoid concentrated exposure to weather including sunlight and extremes of heat.

(R. at 19). The ALJ determined at step four that Plaintiff had no past relevant work. (*Id.* at 23). At step five, based on Plaintiff's RFC, her vocational factors, and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the local economy that Plaintiff can perform, including small parts assembler, mail clerk, and plastic product assembler. (*Id.* at 23–24). Accordingly, the ALJ concluded that Plaintiff was not under a disability, as defined by the Act, from the alleged onset date through the date of the ALJ's decision. (*Id.* at 24).

The Appeals Council denied Plaintiff's request for review on July 21, 2016. (R. at 1–3). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Act. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The

---

that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008).

4

Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

# IV. RELEVANT MEDICAL EVIDENCE

On October 19, 2012, Plaintiff presented to the emergency department at Regions Hospital with complaints of scalp itchiness, sores, and pus pockets. (R. at 306). Plaintiff reported a history of scalp sores secondary to discoid lupus erythematosus (DLE) for several years. (*Id.*). The sores were located over the back of her head. (*Id.*). Plaintiff stated the sores were improving with steroid shots and prescription strength steroid creams in 2006, but she could no longer afford them and had to switch to over-the-counter hydrocortisone cream and triple antibiotic cream only. (*Id.*). She indicated that her sores worsen intermittently due to stress or colds. (*Id.*). Plaintiff stated that lately her sores were the worst they had ever been, despite no increase in stress level, and the over-the-counter creams were no longer providing relief. (*Id.*). A physical examination by Dr. Bradley Hernandez revealed a "tender, pink, balding patch of inflamed skin the size of a Yamaka located at the same location of a Yamaka." (*Id.* at 307). (*Id.*). There was a second, small 2.5 cm sore located posteriorly to the left ear. (*Id.*). Dr. Hernandez assessed alopecia and discoid lupus, and discharged Plaintiff home with a prescription of Lidex cream. (*Id.*).

Plaintiff returned to Regions Hospital on March 18, 2013, for an evaluation of a "pus pocket" on the top of her head, and expressed concern that her discoid lupus was spreading. (R. at 324). She reported that the lesions were restricted to her scalp, but that she had "dry patches" on her forearms. (*Id.*). She was taking the Lidex twice daily. (*Id.*). Upon physical examination, Dr. Joel Holger noted

atraumatic lesions in the midline anterior scalp with multiple areas of hair loss, inflammatory areas on occiput and the crown of the head, and a firm, hard lesion of chronic discoid lupus erythematosus. (*Id.* at 325). Plaintiff was prescribed Percocet and instructed to follow up with a dermatologist within the week. (*Id.*).

On March 28, 2013, Plaintiff sought treatment from Michelle Ovando, PA-C, at Dermatology Associates. (R. at 344). Plaintiff reported flaring for the past six months, particularly in recent weeks. (*Id.*). Plaintiff noted pus lumps, sore flares, and achy joints. (*Id.*). A physical examination revealed multiple 1–2 cm cysts, 2–3 positive diffuse pink "A2" patches, and a left infected abscess with drainage. (*Id.*). PA Ovando ordered routine labs and prescribed Bactrim. (*Id.*). The following week, Plaintiff's scalp cyst was noted to be resolving, although two or more discoid lesions were still present. (*Id.* at 351). Plaquenil[4] was initiated at this time. (*Id.*). When Plaintiff returned for a follow-up visit in May, Plaintiff reported she was "doing ok," and one or two active patches were noted on the scalp. (*Id.* at 352). Bactrim was discontinued due to side effects. (*Id.*).

On August 10, 2013, Plaintiff presented to internal medicine physician David Ellens, M.D.,[5] for an evaluation. (R. at 394). Plaintiff gave a history of systemic lupus, and reported she was presently seeing a dermatologist concerning her alopecia due to scarring from her lupus, and that she was receiving injections in her

---

[4] Plaquenil is an antirheumatic medicine and is used to treat symptoms of rheumatoid arthritis and discoid or systemic lupus erythematosus. <https://www.drugs.com/plaquenil.html>

[5] The ALJ and both parties erroneously referred to Dr. Ellens as "Dr. Ellen."

scalp areas for treatment. (*Id*.). She reported occasional fatigue and tiredness. (*Id*.). Dr. Ellens observed multiple areas of balding scarring on the scalp and assessed alopecia and systemic lupus erythematosus. (*Id*. at 395). Plaintiff was given a referral to a rheumatologist for further evaluation. (*Id*.).

Plaintiff returned to PA Ovando on August 13, 2013. (R. at 358, 405). Three or more erythematous patches with alopecia were noted. (*Id*. at 358). Plaquenil was continued, and betamethasone dipropionate cream (Beta Dip)[6] was prescribed for the scalp. (*Id*. at 358, 405). A few days later, Plaintiff reported having a flare up on her scalp, which seemed to be related to using the Beta Dip. (*Id*. at 357). The following week, Plaintiff reported feeling "a little better" and less sore. (*Id*. at 360). However, the patches on the scalp remained. (*Id*. at 360, 403).

On September 13, 2013, Plaintiff returned to Dr. Ellens for a complete physical and public aid evaluation. (R. at 393). Physical examination was relatively normal; Dr. Ellens again noted the multiple areas of balding scarring on the scalp area. (*Id*. at 394). Plaintiff's complaints of occasional fatigue and tiredness persisted. (*Id*. at 393).

Plaintiff presented to Raymond Kazmar, M.D., a rheumatologist with South Suburban Arthritis Group, for an initial evaluation on October 16, 2013. (R. at 488–89). Dr. Kazmar assessed severe discoid lupus causing loss of hair, along with skin thinning, areas of induration and severe tenderness and infected blisters requiring

---

[6] Betamethasone dipropionate cream is a topical corticosteroid used for reducing itching, redness, and swelling associated with many skin conditions. < https://www.drugs.com/cdi/betamethasone-dipropionate-cream.html>

antibiotic treatment. (*Id.* at 488). Similar lesions were noted on the left ear, right eye, and facial area. (*Id.*). Dr. Kazmar noted that Plaintiff needed chronic use of Prednisone, Plaquenil, and steroid cream. (*Id.*). He indicated that a reduction in medications caused a flare up of skin lesions. (*Id.*). Dr. Kazmar further assessed arthritis pain in the knees and spine, and ordered x-rays of both knees. (*Id.*).

At a routine check-up with Dr. Ellens on November 13, 2013, Plaintiff reported no flares of her lupus but continued to complain of occasional tiredness and fatigue. (R. at 392). The next day, Plaintiff followed up with Dr. Kazmar. (*Id.* at 486–87). Dr. Kazmar noted scattered areas of redness and tenderness on the scalp and recommended continued use of the Prednizone and Plaquenil. (*Id.*). On December 28, 2013, Plaintiff's DLE appeared to be controlled with medications, although Plaintiff reported occasional scalp tenderness and itchy, dry patches on her arms and legs. (*Id.* at 381). PA Ovando assessed "eczematous dermatitis, legs and arms." (*Id.* at 402). By February 2014, the eczematous dermatitis had spread to the face and shoulders. (*Id.* at 380, 401). Cephalexin was prescribed and Allegra was recommended. (*Id.*).

In January 2014, Plaintiff returned to Dr. Kazmar with complaints of bilateral knee pain, especially when ascending/descending stairs and when squatting. (R. at 483, 485–86). A physical examination revealed tenderness of the medial patellar joint line. (*Id.* at 485). X-rays of the knees performed on January 20, 2014, were unremarkable, with no evidence of significant joint degeneration. (*Id.* at 484).

Plaintiff next followed up with Dr. Ellens on January 31, 2014, requesting assistance with completing her disability packet. (R. at 391). Plaintiff expressed concern about intermittent chest pain and reported pain in her legs for the past few months. (*Id.*). She also stated that the medicated lotion prescribed by dermatology was causing her to itch. (*Id.*). Plaintiff reported occasional fatigue and tiredness and occasional swelling of the extremities, but denied shortness of breath. (*Id.*). Dr. Ellens completed Plaintiff's disability packet and instructed Plaintiff to discontinue use of the medication lotion and switch to Vaseline. (*Id.*).

Plaintiff consulted with Kelly Rychter, D.O., with South Suburban Cardiology Associates, on March 3, 2014, regarding her complaints of chest pain and dyspnea. (R. at 374–76). Plaintiff indicated that in the past few months, she had been experiencing sharp chest pains lasting only a few seconds unrelated to exertion, and shortness of breath when walking. (*Id.* at 374). Plaintiff additionally reported joint aches, fatigue, and dizziness, and a rash was noted on physical examination. (*Id.* at 374, 376). Dr. Rychter recommended a cardiac stress test for further evaluation of Plaintiff's symptoms. (*Id.* at 376). The stress test was inconclusive and had to be stopped due to generalized fatigue. (*Id.* at 425). The impression was a severe reduced exercise tolerance for Plaintiff's age and gender. (*Id.*). When Plaintiff followed up with Dr. Rychter on April 7, 2014, she again reported complaints of chest pain, shortness of breath with exertion, joint aches, fatigue, and dizziness. (*Id.* at 371). Plaintiff stated that she had been feeling more fatigued than usual, and her rash was still present on physical examination. (*Id.* at 371–72).

Dr. Kazmar noted continued bilateral patellofemoral knee pain and a new onset of lumbar spine pain on April 10, 2014. (R. at 482). Plaintiff had contacted Dr. Kazmar in February and reported calf and posterior thigh pain. (*Id.* at 483). She indicated that this pain had increased in intensity since that time. (*Id.* at 482). Dr. Kazmar prescribed Mobic[7] and ordered x-rays of the lumbar and thoracic spines, which were negative. (*Id.* at 480–82). On June 12, 2014, at Plaintiff's final visit of record with Dr. Kazmar, Plaintiff reported scalp tenderness, severe knee pain with squatting and climbing stairs, and spinal discomfort at thirty degrees lumbar flexion. (*Id.* at 479). Subsequent x-rays of the hips and pelvis were normal. (*Id.* at 426).

Plaintiff continued to complain of feeling tired and fatigued at her next two visits with Dr. Ellens in August and September 2014. (R. at 387–89). On September 3, 2014, Plaintiff reported a scalp "flare" and continued joint pain. (*Id.* at 379). Mupiricin ointment was prescribed for multiple "crusty" spots on Plaintiff's scalp. (*Id.* at 379, 400). In October 2014, Plaintiff reported shortness of breath with exertion. (*Id.* at 388).

Plaintiff testified that she experiences pain every day in her back and her knees. (R. at 45). She described the pain as a "dull ache" that is constantly present. (*Id.*). Getting up and moving around makes the pain worse. (*Id.*). Plaintiff stated that she can stand for about five minutes, and usually lays down for about an hour during

---

[7] Mobic (meloxicam) is a nonsteroidal anti-inflammatory drug (NSAID). Mobic is used to treat pain or inflammation caused by rheumatoid arthritis and osteoarthritis in adults. https://www.drugs.com/Mobic.html.

the day. (*Id.* at 47). She estimated that she can walk past only two or three houses before having to stop and catch her breath. (*Id.*). In addition, her sores cause severe pain and migraine headaches. (*Id.* at 52). Plaintiff has difficulty concentrating at all times because of the pain, the rashes, the itching, and the migraines. (*Id.*).

Plaintiff typically has three or four bad days a week. (R. at 50). On her bad days, she is unable to do much at all. (*Id.*). She has trouble sleeping at night because of her pain and her medications. (*Id.* at 48). Plaintiff testified that, although her current medications help to a certain extent, she feels like the medications also make "different things" act up, and seem to make things worse. (*Id.* at 42–43). She stated that her skin breaks out, and she gets rashes on her face, chest, shoulders, legs, and stomach. (*Id.* at 43). Other side effects from her medications include nausea, migraines, and dizziness. (*Id.* at 53). They also occasionally make her emotional (*i.e.*, stressed out and worried). (*Id.*).

She is able to care for herself and perform minor household tasks, such as folding clothes, cooking, and washing dishes. (R. at 48). Plaintiff reported challenges in caring for her three year-old son, including being unable to lift him or play with him because he moves too fast. (*Id.* at 48–49). Plaintiff indicated that Dr. Ellens instructed her not to lift her son because it exacerbates her back pain. (*Id.* at 49).

## V. DISCUSSION

Plaintiff contends that the ALJ's decision contains errors of law and is not supported by substantial evidence because (1) the ALJ failed to consider Listing 14.02 (systemic lupus erythematosus) and Listing 12.05(C) (intellectual disability);

(2) the ALJ improperly weighed the medical opinions regarding Plaintiff's mental and physical impairments, and (3) the ALJ improperly assessed Plaintiff's credibility and subjective symptoms. (Dkt. 15 at 4–15).

## A. The ALJ Did Not Properly Evaluate the Treating Physician's Opinion

Plaintiff first argues that, in light of Dr. Ellens's opinion that Plaintiff met or equaled Listing 14.02,[8] it was error for the ALJ to omit consideration of that issue. (Dkt. 14 at 7–8). In general, the claimant bears the burden of proving her condition meets all the criteria of a listing. *Ribaudo v. Barnhart,* 458 F.3d 580, 583 (7th Cir. 2006). However, an ALJ's listing determination "must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart,* 381 F.3d 664, 668 (7th Cir. 2004) (citing *Brindisi ex rel. Brindisi v. Barnhart,* 315 F.3d 783, 786 (7th Cir. 2003)); *Scott,* 297 F.3d at 595–96; *Steele,* 290 F.3d at 940. If evidence exists in the record that might establish that a listing's criteria have been met, as is the case here, an ALJ cannot simply ignore it without explanation. *Ribaudo,* 458 F.3d at 583. Thus, the ALJ's failure to provide any analysis of why Plaintiff's impairments did not satisfy Listing 14.02 is particularly problematic

---

[8] Listing 14.02, systemic lupus erythematosus (SLE), requires:

**A.** Involvement of two or more organs/body systems, with:
1. One of the organs/body systems involved to at least a moderate level of severity; and
2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).
OR
**B.** Repeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
1. Limitation of activities of daily living.
2. Limitation in maintaining social functioning.
3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

considering that the medical evidence of record suggests that Plaintiff may be disabled under either or both of two subsections of Listing 14.02. Accordingly, Plaintiff contends that the ALJ ran afoul of the treating physician rule by not affording controlling weight to Dr. Ellens's opinion that she met or equaled Listing 14.02.

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627

F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted).

Furthermore, even where a treater's opinion is not given controlling weight, an ALJ must still determine what value the assessment does merit. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Campbell*, 627 F.3d at 308. In making that determination, the regulations require the ALJ to consider a variety of factors, including: (1) the nature and duration of the examining relationship; (2) the length and extent of the treatment relationship; (3) the extent to which medical evidence supports the opinion; (4) the degree to which the opinion is consistent with the entire record; (5) the physician's specialization if applicable; and (6) other factors which validate or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)–(6). In sum, "whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)).

The ALJ's opinion must build an "accurate and logical bridge from the evidence to [the] conclusion so that [the] reviewing court[ ] may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young*, 362 F.3d at 1002 (citations omitted). To build a logical bridge, the ALJ must "sufficiently articulate his assessment of the evidence to assure [the court] that he considered the important evidence and to enable [the court] to trace the path of his reasoning." *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citation omitted).

Here, Dr. Ellens opined that Plaintiff met or equaled Listing 14.02, systemic lupus erythematosus (SLE), in that Plaintiff had at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and she has limitations in maintaining social functioning and completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. (R. at 365). Additionally, Dr. Ellens opined that Plaintiff would have difficulty lifting more than ten pounds occasionally and five pounds frequently. (*Id.* at 366). She could walk less than one hour in an eight-hour workday and sit less than two hours of an eight-hour workday. (*Id.*). He further limited Plaintiff to occasional pushing/pulling with hands, frequent balancing, and prohibited any climbing of ramps/stairs, ladders or ropes. (*Id.*). He opined she should never crouch or crawl and could occasionally reach and handle. (*Id.*). She would have frequent ability to fingering and feeling. (*Id.*).

The ALJ rejected Dr. Ellens's opinion for several reasons. First, the ALJ concluded that, because Plaintiff requested Dr. Ellens's assistance with her disability paperwork, there was evidence of "pecuniary gain" and a "bias on the doctor's part" to help Plaintiff by "painting her in an unflattering light." (R. at 22). Second, the ALJ referenced Plaintiff's activities of daily living, such as caring for her young child, going shopping, and performing light household tasks, and concluded that such activities were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (*Id.* at 21–22). Third, the ALJ noted that Dr. Ellens is "not a specialist in Lupus but in internal

medicine." (R. at 22). Fourth, the ALJ concluded that Dr. Ellens's opinion was "not consistent with the record as a whole." (*Id.*). Finally, the ALJ concluded that Plaintiff's condition was controlled with medications. (*Id.*). The Court concludes that the ALJ's decision to give Dr. Ellens's opinion only little weight is legally insufficient and not supported by substantial evidence.

### 1. *Pecuniary Gain and Bias*

First, the ALJ offered no support for his finding of "pecuniary gain" or his contention that the opinion of Dr. Ellens may have been biased because Plaintiff requested his assistance in completing a disability packet. (R. at 22). True, the ALJ has the ability, as the trier of fact, to consider a physician's possible bias. *Edwards v. Sullivan*, 985 F.2d 334, 337 (7th Cir. 1993). However, "[t]he ability to consider bias . . . is not synonymous with the ability to blithely reject a treating physician's opinion or to discount that physician's opportunity to have observed the claimant over a long period of time." *Micus v. Bowen*, 979 F.2d 602, 609 (7th Cir. 1992). The ALJ must have a substantial evidentiary basis for finding bias by the treating physician. *Moss v. Astrue,* 555 F.3d 556, 560 (7th Cir. 2009). Here, the ALJ merely stated, "I find pecuniary gain that means there was a bias on the doctor's part to help the claimant by painting her in an unflattering light," yet offered no evidentiary basis for this conclusion. (R. at 22). This is error. *See White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999) ("a decision based on speculation is not supported by substantial evidence."). Furthermore, the ALJ's assertion that Dr. Ellens's opinions were not generated through course of treatment is equally

unsupported and erroneous. Dr. Ellens saw and examined Plaintiff on four separate occasions prior to completing the disability paperwork, and continued to treat Plaintiff long after the paperwork was completed. (R. at 385–95). Simply put, the mere fact that Plaintiff was seeking assistance with her disability paperwork is not an appropriate reason to discredit Dr. Ellens's opinions. *See McClinton v. Astrue*, No. 09 C 4814, 2012 WL 401030, at *12 (N.D. Ill. Feb. 6, 2012) ("[S]imply because [the plaintiff] was seeking disability and required such paperwork does not mean that the doctor's treatment was any less legitimate. The ALJ simply fails to explain how the completion of necessary paperwork for a patient . . . mitigates the credibility or accuracy of a treating doctor's medical opinion.").

### 2. *Activities of Daily Living*

Next, the ALJ cited Plaintiff's ability to care for her young child, go shopping, and perform simple household tasks as an additional basis for discrediting Dr. Ellens's opinion. (R. at 22). However, the ALJ failed to articulate *how* Plaintiff's reported daily activities contradicted Dr. Ellens's findings. *See Clifford*, 227 F.3d at 871 (finding that the ALJ did not provide any explanation for his belief that the claimant's activities were inconsistent with the treating physician's opinion and his failure to do so constitutes error). Without such a logical bridge, the Court cannot trace the path of the ALJ's reasoning.

As the Seventh Circuit has explained on numerous occasions, an ALJ may not equate the ability to perform basic household work and child care with the ability to hold a job. This is because "extrapolating from what people do at home, often out of

necessity, to what they could do in a 40-hour-a-week job is perilous . . . and sheer necessity may compel one to perform tasks at home no matter how painful." *Forsythe v. Colvin*, 813 F.3d 677, 679 (7th Cir. 2016); *see also Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (holding that the ALJ's "casual equating of household work to work in the labor market cannot stand," especially because the ALJ attached great significance to the fact that the claimant was "able to care for her personal needs and those of her two small children.").

The ALJ, in placing particular emphasis on Plaintiff's ability to care for her young child, completely disregarded and/or ignored Plaintiff's testimony and other evidence in the record that suggests Plaintiff is significantly limited in her ability to care for her son. For example, Plaintiff testified that she has extreme difficulty lifting her son up, cannot take him for walks, and is unable to move as quickly as necessary to keep up with him. (R. at 48–49, 250, 369). In fact, Plaintiff stated that Dr. Ellens specifically told her not to pick up her son. (*Id.* at 49). Plaintiff additionally reported the she receives significant assistance from her mother and two sisters in caring for her son. (*Id.* at 208).

Further, the ALJ did not properly take into account the limitations Plaintiff described in performing basic daily activities such as bathing, minor household chores, and preparing simple meals. For instance, Plaintiff has indicated, in function reports and disability reports, that while she is able to prepare meals for herself, she is limited to quick, simple meals such as "microwave foods." (R. at 209, 241). In performing household tasks, Plaintiff is limited to making her bed and

doing laundry, although she is unable to carry the laundry up and down the stairs. (*Id.* at 209, 241, 250). She has also reported difficulty getting in and out of the bathtub, and an inability to take long showers due to leg pain and weakness. (*Id.* at 246, 250). Plaintiff additionally indicated that it is difficult for her to do daily activities because she tires so quickly. (*Id.* at 242). Moreover, the ALJ also failed to consider the written statement of Plaintiff's mother, Ina Jackson, which confirmed many of the limitations Plaintiff testified to. (*Id.* at 219–26). "An ALJ cannot disregard a claimant's limitations in performing household activities." *Moss*, 555 F.3d at 562.

In sum, the ALJ did not "build a logical bridge between the evidence and his conclusion" when he failed to discuss these limitations when finding that Plaintiff's activities are inconsistent with the limitations recommended by her treating physician. *Pratt v. Colvin*, No. 12 C 8983, 2014 WL 1612857, at *8–10 (N.D. Ill. Apr. 16, 2014).

### 3. Physician's Specialty

As for the ALJ's suggestion that Dr. Ellens's opinion deserves less weight because he is an internal medicine physician and not a specialist in Lupus, this factor is only relevant if the doctor's opinion is not given controlling weight for proper reasons. *See* 20 C.F.R. § 404.1527 (explaining that it is only when the treating source's opinion is not given controlling weight that factors including specialization are considered). Assuming, *arguendo,* that the ALJ had proper reasons for not giving controlling weight to Dr. Ellens's opinion, it was perfectly

acceptable for him to consider the doctor's lack of expertise. In this case, the ALJ discounted Dr. Ellens's opinion because of his area of expertise, but did not do the same for the state agency consultants in his evaluations of their opinions. Instead, the ALJ simply concluded that the consultants were "well qualified by reason of training and experience in reviewing an objective record and formulating an opinion as to limitations," despite having the same lack of specialization as Dr. Ellens. (R. at 22).

Indeed, the Court is troubled, and frankly somewhat puzzled, by the ALJ's explanation of the weight given to the opinions of the state agency consultants. The ALJ assigned "great weight" to the assessments of the state agency consultants, "as the assessment [sic] with the medical record in its entirety." (R. at 22). However, upon review of the record, it is clear that this is an inaccurate assertion by the ALJ. Instead, the record indicates that the agency consultants arrived at their determinations without considering Dr. Ellens's opinion and listing equivalence form or the records from Plaintiff's treating rheumatologist (and thus a specialist in Lupus), Dr. Kazmar. The ALJ attempted to side-step this issue by concluding, without any explanation, that "the evidence received into the record after the reconsideration determination concerning the claimant's physical status did not provide any credible or objectively supported or new material information that would significantly alter the State agency findings." (R. at 22–23). It is not clear how the ALJ could arrive at such a conclusion in light of the nature of this later-received evidence.

In any event, because neither of the state agency physicians reviewed records from Drs. Ellens and Kazmar, the state agency physicians' assessments do not, by definition, take into account all of the medical evidence in the record. In this situation, the ALJ could have sent Plaintiff for a consultative exam, requested that the state agency physicians render supplementary opinions based on a review of the entire record, or brought in a medical expert to testify at the hearing. But the ALJ did none of those things. Therefore, the medical opinions relied upon by the ALJ to contradict the opinion of Plaintiff's treating physician were not based on a complete review or an accurate summary of all the relevant medical evidence. *See Bellinghiere v. Astrue*, No. 10 C 6184, 2011 WL 4431023, at *7 (N.D. Ill. Sept. 22, 2011); *Ivey v. Astrue,* No. 11 CV 083, 2012 WL 951481, at * 13 (N.D. Ind. Mar. 20, 2012) (an ALJ's decision to give more weight to a reviewing state agency physician's opinion "cannot stand where it lacks evidentiary support and is based on an inadequate review of [the claimant's] subsequent medical record"); *Staggs v. Astrue,* 781 F. Supp. 2d 790, 794–95 (S.D. Ind. 2001) (remanding with instructions to obtain and consider an updated medical opinion based on all of the evidence in the record where the ALJ relied upon the state agency physicians' opinions that did not take subsequent medical records into account and therefore were not based on the entire medical record). As a result, without sufficient medical evidence to support his decision to reject Dr. Ellens's opinions, the Court concludes that the ALJ impermissibly substituted his judgment for that of Plaintiff's treating physician.

Moreover, the Court notes that, although the state agency consultants considered only Listing 8.04 (chronic infections of skin or mucous membranes), and despite Plaintiff's requests for consideration of Listing 14.02, the sole listing considered by the ALJ at step three was, inexplicably, Listing 14.09 (inflammatory arthritis). (R. at 19, 68, 76, 87, 96). And, apart from stating that he "considered" Listing 14.09, the ALJ did not mention the requirements of Listing 14.09, or provide any analysis as to why Plaintiff's impairments did not satisfy the listing. In fact, the word "arthritis" does not appear once in the remaining five pages of the ALJ's opinion.

### 4. Opinion Not Consistent With the Record as a Whole

Next, although the ALJ found that "the record as a whole" does not support Dr. Ellens's opinion, the ALJ never explained *how or where* the record is inconsistent with Dr. Ellens's findings. The Court is left guessing as to which part of the record the ALJ relied. It is vital that the ALJ support his findings with substantial record evidence. "The statement that [Dr. Ellens's] opinion is not supported by the record as a whole, without more, does not suffice." *Thunberg v. Astrue*, 2014 WL 971458, at *11 (N.D. Ill. Mar. 12, 2014). The ALJ has not built a logical bridge to support his opinion. Other than a blanket citation to the records from Dermatology Associates, the ALJ provided no actual, specific medical evidence for discounting Dr. Ellens's opinion, particularly as it relates to Listing 14.02.

True, the ALJ provided a summary of some (but not all) of Plaintiff's medical records earlier in his opinion. (R. at 20–21). But "summarizing a medical history is

not the same thing as analyzing it, in order to build a logical bridge from evidence to conclusion." *Chuk v. Colvin*, No. 14 C 2525, 2015 WL 6687557, at *8 (N.D. Ill. Oct. 30, 2015); *see also Edge v. Berryhill*, No. 15 CV 50292, 2017 WL 680365, at *4 (N.D. Ill. Feb. 21, 2017).

The ALJ ignored much of the evidence that does support Dr. Ellens's findings. For instance, the record is replete with evidence of Plaintiff's continuous complaints of fatigue (*see, e.g.*, R. at 242, 246, 371, 374, 387–89, 391–94, 433, 502, 556), yet the ALJ's opinion is devoid of any reference to fatigue. Similarly, the ALJ barely mentioned Plaintiff's frequent complaints of muscle aches and joint pain. (*See, e.g.*, *id.* at 238, 240–42, 246, 344, 371, 374, 479, 481–82, 485–86, 488–89). The ALJ also referenced the normal findings on x-rays taken of Plaintiff's knees, lumbar spine, and thoracic spine, and asserted that the "objective imaging studies do not support the degree of limitations or severity as alleged" and "the relative normalcy of the above noted findings does not suggest a severe impairment as defined by the Act." (*Id.* at 21–22). The ALJ's discounting of Dr. Ellens's opinion "based on the *ALJ's* perception that joint findings would be markedly profound if [Dr. Ellens's] opinion were accurate highlights the danger of the ALJ making a medical determination for which [he] is not qualified." *Warren v. Colvin*, No. 15 C 8987, 2017 WL 36404, at *7 (N.D. Ill. Jan. 4, 2017) (emphasis in original).

Arthritis or synovitis is common in SLE, with up to 90% of patients experiencing it at some point in time. *See Warren*, 2017 WL 36404, at *7 (citing https://www.hss.edu/conditions_joint-pain-lupus-really-arthritis.asp). The pain is

usually more severe than expected based on the appearance of the joint on examination, and there can be pain without swelling or even tenderness in the joint, known as arthralgia. *Id.* "The Court is not attempting to inject its own factual findings into the matter but is only using this information to illustrate why it was inappropriate for the ALJ to reject [Dr. Ellens's] medical opinion regarding [Plaintiff's] functional limitations based on an unstated medical assumption the ALJ apparently was making without evidentiary support in the record to back it up." *Id.*; *see also Martin v. Sullivan*, 750 F. Supp. 964, 970 (S.D. Ind. 1990) (rejecting Appeal Council's finding that claimant's testimony regarding his symptoms was inconsistent with medical finding that claimant "had a full range of motion with no swelling, erythema, or increased warmth in the joint area" on the ground that "the ALJ's own medical advisor" stated that "lupus is a medical impairment that results from physical abnormalities reasonably expected to produce pain" and that "[l]upus patients may develop joint pains . . . that are not accompanied by inflammatory changes").

In sum, the ALJ's "analysis" merely refers to "the record as a whole." (R. at 22). He does not directly connect the evidence—or build a "logical bridge"—to his findings. This prevents the Court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595.

### 5. *Condition Controlled with Medications*

Lastly, the ALJ discounted Dr. Ellens's opinion by asserting that Plaintiff's condition was "controlled with medication." (R. at 22). However, the record indicates

that her symptoms were not controlled with medication. For instance, new symptoms arose, old symptoms worsened and new medications were tried. New symptoms included chest pain and shortness of breath, while complaints of fatigue, joint pain, and back pain continued. For example, PA Ovando's September 3, 2013, correspondence to Dr. Ellens included a new diagnosis of "seborrheic dermatitis, left inframammary," and a prescription for Minocycline. (*Id.* at 404). On December 28, 2013, PA Ovando assessed "eczematous dermatitis, legs and arms." (*Id.* at 402). In February 2014, the eczematous dermatitis had spread to the face and shoulders. (*Id.* at 380, 401). Cephalexin was prescribed and Allegra was recommended. (*Id.*). On September 3, 2014, Plaintiff reported a scalp "flare" and continued joint pain. (*Id.* at 379). Mupiricin ointment was prescribed for multiple "crusty" spots on Plaintiff's scalp. (*Id.* at 379, 400). Treatment records from October 2013, November 2013, January 2014, March 2014, April 2014, and June 2014 all contain reports of joint pain. (*Id.* at 371–75, 479–89). Dr. Kazmar specifically noted in April 2014 that Plaintiff was not responding to Mobic. (*Id.* at 481). These records were never addressed by the ALJ in his analysis.

The ALJ also disregarded Plaintiff's numerous reports of adverse side-effects from her medications, including rashes on her face, chest, shoulders, legs, and stomach, headaches, nausea, fatigue, dizziness, blurry vision, and joint pain. (*See*, *e.g.*, R. at 43, 53, 212, 214, 226, 240, 249, 277, 352, 357, 372, 374, 391). Thus, in reaching his conclusion, the ALJ committed the same error the Seventh Circuit has so frequently warned against: he "focused solely on the reports of stability and

ignored the many complaints of persisting symptoms." *Roth v. Colvin*, N. 14 C 04406, 2016 WL 890750, at *9 (N.D. Ill. March 9, 2016) (citing *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). Accordingly, the ALJ erred in concluding that because the record evidence reflected some improvement and response to medications, it did not support Dr. Ellens's opinion.

In sum, the ALJ provides no "good reasons" for discounting the treating physician's opinion. The ALJ failed to build a "logical bridge" between the facts of the case and the outcome. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). This prevents the Court from assessing the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence.

On remand, the ALJ shall reevaluate the weight to be afforded to the opinion of Dr. Ellens. If the ALJ finds "good reasons" for not giving the opinion controlling weight, *see Campbell*, 627 F.3d at 306, the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss*, 555 F.3d at 561, in determining what weight to give the opinion.

## B. Other Issues

Because the Court is remanding to reevaluate the weight to be given to the treating physician's opinion, the Court chooses not to address Plaintiff's other arguments. However, on remand, after determining the weight to be given the

treating physician's opinion, the ALJ shall then reevaluate Plaintiff's physical and mental impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of his findings in accordance with applicable regulations and rulings. "In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, even limitations that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) (citation omitted). Finally, with the assistance of a VE, the ALJ shall determine whether there are jobs that exist in significant numbers that Plaintiff can perform.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment [14] is **GRANTED**. Defendant's motion for summary judgment [18] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this Opinion.

Dated: August 23, 2017                     E N T E R:

_____
MARY M. ROWLAND
United States Magistrate Judge